Ernest STEVENSON, Petitioner,

v.

Otto C. BOLES, Warden of the West Virginia State Penitentiary, Respondent.

Civ. A. No. 1243–W.

United States District Court
N. D. West Virginia,
at Wheeling.

Sept. 5, 1963.

Tom T. Baker, Huntington, W. Va., for petitioner.

Claude A. Joyce, Asst. Atty. Gen., for respondent.

CHARLES F. PAUL, District Judge.

Ernest Stevenson is under sentence of death, by electrocution, for first degree murder. Execution has been stayed pending the disposition of these proceedings. The order of conviction was by the common pleas court of Cabell County on September 22, 1960, after a trial in which the jury returned a verdict of guilty of first degree murder without recommendation of mercy. The conviction was affirmed, on appeal, by the Circuit Court of Cabell County, and, ultimately, by the Supreme Court of Appeals of the State of West Virginia, on July 3, 1962, by a divided court. The Opinion of the Supreme Court of Appeals and the dissenting Opinion by Judge Haymond are reported in W.Va., 127 S.E.2d beginning at page 638. The Supreme Court denied certiorari (372 U.S. 938, 83 S.Ct. 886, 9 L.Ed.2d 768).

Petitioner attacks the conviction on two grounds: (1) That he was not accorded due process and a fair trial because the jury, while ordered sequestered, was improperly supervised and that certain of the jurors were permitted outside contacts which may have subjected them to improper influences; and (2) that the court improperly admitted, over objections, the testimony of three police officers with reference to an alleged oral confession, which confession, if made, was coerced and not voluntary.

At the outset, the State urges that the alleged errors, both procedural and involving issues of the State and Federal Constitutions, have been fully considered and decided upon direct appeal, and that this court has no jurisdiction to review them upon collateral attack, and should give binding effect to the decision of the Supreme Court of Appeals in this case.

■ It is true, of course, that, under our system of dual federalism, the State courts as well as the Federal apply the principles of the United States Constitution. This court labors under no delusion that he acts as a reviewing court over the highest court of the State. On the other hand, with reference to federal questions, and particularly the fundamental law, this court has certain inescapable duties. His duties in this case are made crystal clear by the recent pronounce-

ments of the Supreme Court in Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770. The Chief Justice, speaking for the court, at page 318 of 372 U.S., at page 759 of 83 S.Ct., at page 789 of 9 L.Ed.2d, said:

"Although the district judge may, where the state court has reliably found the relevant facts, defer to the state court's findings of fact, he may not defer to its findings of law. It is the district judge's duty to apply the applicable federal law to the state court fact findings independently. The state conclusions of law may not be given binding weight on habeas."

■ In performance of his inescapable duties, this court will follow this mandate and will give to the findings of fact of the State courts, where fairly determined and supported by the record, binding effect, and will give to the conclusions of law of the Supreme Court of Appeals the persuasive effect of the reasoning explained in the language employed—he can do no more.

■ Guided by these principles, it becomes apparent that the petitioner's first attack upon the conviction must fail in this court. The Supreme Court of Appeals held that, under applicable West Virginia law, it is the burden of the defendant to show prejudice resulting from any failure of the custodial officers to keep the jury properly sequestered, even in capital cases, and that no such prejudice is here shown. The State law has been authoritatively determined, and certainly the record falls far short of showing that the jurors were subjected to improper influences which might render the accused's trial violative of the tests of fundamental fairness inherent in due process. In fact, if the State law permitted complete separation of the jurors, even this would not seem to violate due process. Mr. Justice Holmes, in Holt v. U. S. (1910), 218 U.S. 245, at 250 and 251, 31 S.Ct. 2, at 5, 54 L.Ed. 1021, at 1029, observed that there is no federal requirement that a jury be kept seques-

tered, even in a capital case, and that a good number of the States have no such requirement.

The second of the petitioner's contentions, involving the alleged oral confession, presents very more serious and difficult questions. The facts are without substantial dispute, and, as set forth in the majority and dissenting Opinions of the Supreme Court of Appeals, are substantially supported by the record, and were not, in any material respect, challenged in the hearing in this court. A short restatement of the facts seems appropriate here.

The petitioner is a Negro, possessed of a seventh grade education, and 23 years old at the time of the alleged offense. He had no previous record of crimes involving violence, but he had been convicted of a misdemeanor involving the unauthorized use of a car. His only work experience was irregular employment as a handyman. He had served 2½ years in the army as an "ammo carrier", and never advanced beyond the rank of private. On the evening of February 4, 1960, the accused consumed a pint of whiskey at his sister's home, where he resided, between 10:00 P.M. and midnight. He went out shortly after midnight and, after walking some blocks, found a storeroom, housing a fish market, lighted and the front door open, and he entered. The fish market was in charge of one, Louise Davis, a mature Negro woman.

At about 11:00 A.M. February 5th, the owner of the fish market returned to open up for the day and found the front door closed but not locked. After entering, he discovered the body of Louise Davis back of a partition which divided the storeroom into two parts, brutally murdered. Her skull had been crushed, her lung pierced, her jaw broken and her face and nose lacerated and broken. She was covered with blood. Her clothing had been disarranged; a panty girdle had been pulled off and was still attached to the stocking on one leg, which stocking had been turned inside out. Spermatozoa were found in her vagina.

Stevenson had been seen in the fish market at about 12:25 the morning of the 5th by one witness. Another witness saw him at about 1:10 A.M. standing in the open doorway. Another witness saw him a few minutes later walking away from the vicinity of the fish market.

About noon on February 5th three uniformed policemen, in a police cruiser, arrived at the home where Stevenson was staying and placed him under arrest, announcing that they wanted him to go to headquarters to answer questions about a murder. As the four were proceeding in the cruiser enroute to the police station, one of the policemen suggested that they make a short detour and stop at the fish market. They stopped at the curb about 50 feet from the entrance. The body of the victim had not been removed from the premises, but this fact was not communicated to Stevenson by the police. One of the officers told Stevenson they were going to take him into the fish market; that there was something they wanted to show Stevenson. Stevenson demurred and the police insisted. Again Stevenson pleaded with the police not to take him in, saying that there were a lot of people around there and he didn't want to go in. The police again announced their intention of taking him in, and Stevenson said that it would not be necessary, that he would make a statement and tell the officers all they wanted to know when they got to the police station. The police started to take the accused inside and Sergeant Tomlinson told the accused that he would have to tell them now or they were going to take him inside. Tomlinson testified that he then said "I want to know now did you commit this crime" and that the accused said "yes, I did, please don't take me inside, take me to headquarters". The police then took Stevenson to headquarters where, after what must have been a very short period of questioning, the accused made a statement, which was transcribed and signed. This statement recited that it was given voluntarily with the knowledge that it might be used in court against him, and, when introduced no objection was made by the defense. The statement recited the drinking of the whiskey, his entry into the fish market, and "the next thing I remember I was walking across the street with this hammer in my hand." He hid the hammer in a garbage can in an alley, and the hammer was found by following the directions Stevenson gave. It was covered with blood, and was identified as having come from the fish market. In continuation of the statement, Stevenson told about his walking around until about 3:00 o'clock in the morning, when he went to bed, his awakening at about 11:35 and discovering his clothing blood spattered. He denied having made the oral confession and insisted that he had no recollection of events between the times he entered and left the fish market.

At the trial, and again at the hearing in this court, Stevenson maintained the version of the events recounted in his written statement, except that at the hearing here, he did admit that he might have made the oral confession. At the hearing in this court, he elaborated on the fact that there were a great number of people on the sidewalk around the fish market and people going in and out; that many of them were his friends, and explained that his extreme reluctance to go into the fish market in custody of the police resulted from the fact that he did not want to be embarrassed before his friends. He negatived any fear of mob violence, and insisted that he did not know what was in the fish market or what the police wanted to show him.

It is conceded that, under both West Virginia law and the Federal Constitution, a confession, in order to be admissible in a criminal trial, must have been "voluntary". It is incumbent upon the court at the outset to determine what the test of a voluntary confession is under the applicable rules, in order that the admissibility or nonadmissibility of the oral confession in this case may be judged by the application of proper standards.

Professor Wigmore, in his exhaustive consideration of the subject, in Wigmore

on Evidence, Third Edition, Volume III, pages 228 through 360, argues persuasively that the admissibility of pre-trial confessions is a rule of evidence directed, as are other rules of evidence, at the trustworthiness of the confession as evidence; that the testimony is to be rejected when it has been elicited by an inducement, whether by the application of physical force, the threat thereof, psychological forces or tricks or by false pretenses or promises sufficiently powerful or persuasive as to create a likelihood that an innocent person, under the circumstances, might make a false confession; and that the testimony should be received if the inducement is not of such force. He states the advocated test compendiously (at page 252) as follows:

"Was the inducement such that there was any fair risk of a false confession?"

He even contends that, applying the proper test, if science establishes their infallibility, a confession obtained by unconsented-to use of hypnotism, truth serum or, presumably, the polygraph, would be admissible (see Section 841–a), since the objective is the ascertainment of truth and the protection of the innocent, not an exclusionary rule to protect the guilty. Professor Wigmore argues logically and recites respectable authority, and no doubt, his views would be echoed by many sociologists and especially by the heads of investigative and law enforcement agencies.

It is apparent, from a reading of the Opinion of the majority in State v. Stevenson, that the West Virginia Supreme Court of Appeals used the Wigmore test. It quotes, with approval, from State v. Brady, 104 W.Va. 523, 140 S.E. 546 (1927), as follows:

"The real question in every case as to whether or not a confession is admissible is whether or not the confessing mind was influenced in any way to create a doubt as to the truth of the confession, and over this doubt or question, the trial court has a wide discretion, and this discretion will not ordinarily be disturbed on review.";

and from State v. Goldizen, 93 W.Va. 328, 336, 116 S.E. 687 (1923):

"The real question being whether there has been any threat or promise of such nature that the prisoner would likely tell an untruth for fear of the threat, or hope of profit from the promise.";

and from Greenleaf on Evidence, Volume 1, § 219, as follows:

"The only proper question is whether the inducement held out to the prisoner was calculated to make his confession an untrue one."

Weighed in this balance, the court found that the police actions were not of sufficient force or effect as would likely produce a false confession, and that the oral confession of Stevenson was, therefore, voluntary and admissible, and that no error was committed, even though the trial court conducted no preliminary hearing on the question of the voluntariness of the confession and did not even instruct the jury on that subject.

This court is forced to the conclusion that the majority Opinion in State v. Stevenson applied an improper and unjustifiably limited test to the facts and circumstances.—See Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961).

As early as 1897, the Supreme Court in Bram v. U. S., 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568, in a case involving a federal prosecution for murder, pointed out that the exclusionary rule is available to a guilty person as well as an innocent one, and that it is not concerned with innocence or guilt or with the truth or falsity of the confession; that it is a personal right of the accused akin to the Fifth Amendment privilege against self-incrimination. The Court states the rule (at page 549 of 168 U.S., at page 189 of 18 S.Ct., at page 567 of 42 L.Ed.) as follows: "(i)t (the proof) must be sufficient to establish that the making of the statement was voluntary; that is to say, that from the causes, which the law treats

as legally sufficient to engender in the mind of the accused hope or fear in respect to the crime charged, the accused was not involuntarily impelled to make a statement, when but for the improper influences he would have remained silent." [1]

■■■ For the various statements of the federal test contained in the myriads of Supreme Court decisions on this subject,[2] one need but examine the alternative statements of the test in the latest of the Supreme Court opinions in Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513, in which the court quoted from Lynumn v. Illinois, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963): "(t)he question in each case is whether the defendant's will was overborne at the time he confessed,", and from Wilson v. U. S., 162 U.S. 613, 16 S.Ct. 895, 40 L.Ed. 1090 (1896): "In short, the true test of admissibility is that the confession is made freely, voluntarily and without compulsion or inducement of any sort." It is clear also that the fact that the defendant denies having made the confession has no bearing on its admissibility or inadmissibility, see, e. g., Lee v. Mississippi, 332 U.S. 742, 68 S.Ct. 300, 92 L.Ed. 330 (1948); that the fact that there is other evidence sufficient to convict is of no moment, see, e. g., Lyons v. Oklahoma, 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481 (1944); and that the pressures and inducements may be psychologically coercive as well as physical, see, e. g., Watts v. Indiana, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949) and Blackburn v. Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960). It is also plain that, while by no means determinative, the facts that the accused has not been advised of his right to remain silent; of the fact that his statements may be used against him in court or that he is entitled to representation by counsel, may be considered, among the other circumstances, in weighing the voluntariness of the confession, see, e. g., Turner v. Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949); Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948); and Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958).

■■■ At least since Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936), it has been established that the federal rule and test of admissibility is not simply a pronouncement by the Supreme Court, under its supervisory powers applicable to federal trials, but that it is a fundamental right embraced within the concept of the phrase "due process of law", as used in the Fourteenth Amendment, and as such, it must be recognized and applied by State courts in State prosecutions.

The fact that the Supreme Court has had to deal with this subject so frequently may be explained by the difficulty with which any court is faced in applying the test. It is subjective both with respect to the mind of the accused and, it must be admitted, with respect to the mind of the judge. As the court said in Haynes, "The line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw, particularly in cases such as this where it is necessary to

1. In his note to Section 831, Wigmore on Evidence, Professor Wigmore criticises Bram and the rule which it enunciated in language which can only be characterized as intemperate. He concludes his comments with the following: "(h)ow much longer will that misguided and unrepudiated opinion continue to cloud the reputation of the Federal Supreme Court?" Professor Wigmore's question has been answered by the long line of Supreme Court decisions on this matter to and including its Opinion in Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513, decided May 27, 1963.

2. In footnote 2 of the Opinion in Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (decided in 1959), the court cites 28 Supreme Court Opinions on the subject. Spano, by no means, ended the Supreme Court's work in this field —see the later cases cited in Haynes v. Washington, supra.

make fine judgments as to the effect of psychologically coercive pressures and inducements on the mind and will of an accused." The mind of the judge may consciously or unconsciously be influenced by his sociological views with reference to the competing interests of the effective administration of criminal justice on the one hand, and the individual rights of an accused—particularly a guilty one—on the other.

■ Having considered the applicable rules that outline the considerations apposite thereto, we should now proceed to a consideration of the police actions and Stevenson's reactions in this case.

It seems patent that Stevenson's explanation as to why he capitulated to the importunities of the police are unimpressive. To be consistent with his position at the trial, Stevenson was obliged to admit that he had no knowledge of what might be inside the fish market, and, to explain his reluctance to enter, he urges the embarrassment of being seen in police custody by many of his friends. The prospects of such embarrassment cannot be judged of sufficient force to elicit a confession from anyone—guilty or not guilty—who had a real will to remain silent. It is inconceivable that anyone, to escape the appearance of criminal involvement, would assume the obloquy consequent upon a confession of guilt. Certainly no embarrassment is avoided that way.

Disposing thus of the petitioner's contention does not, however, end this court's duties in the case—he cannot close his eyes to the real reason why the petitioner made his oral confession. That the petitioner had a will not to confess is apparent from his repeated requests not to be taken into the fish market; his efforts to avoid that threatened action by undertaking to tell police what they wanted to know at police headquarters, and his final capitulation when all else had failed. What he meant by telling the police he would make a statement when he reached headquarters is made clear by what he did say after he arrived at

headquarters. There he not only refused to confess his guilt, he insisted that he had no knowledge of the crime, and even denied that he had made the prior oral confession.

It is, perhaps, ironic that, in order to find the exertion of sufficient pressure to overcome free will, it is necessary for this court to postulate the petitioner's guilt or, at least, his guilty knowledge of the crime, since, if he did not have guilty knowledge of what lay within, the threats of the officers to take him in the fish market would not have sufficient force to coerce a genuine will to remain silent or to affirm innocence.

The necessary postulate is not hard to arrive at. The evidence, other than the oral confession, seems amply sufficient to establish, beyond a reasonable doubt, the petitioner's guilty knowledge, and, at the very least, his complicity in the crime or crimes. His defense of temporary amnesia is not worthy of credit, and the jury gave it none. This is not a case in which it is sufficient to say that the applicability of the federal exclusionary rule takes no account of the guilt or innocence of the accused, since here the assumption of guilt is necessary to bring the rule into play. The case points up more vividly than any other which counsel have cited or the court has found, the essential difference between the Wigmore test and that spelled out by the Supreme Court cases.

With the finding that the petitioner knew what he was to see if the police carried out their threats, the conclusion is compelled that those threats were of sufficient force to overbear his will. Given the petitioner's background and his physical condition of recovering from the intoxication and the emotional trauma of a few hours before, it requires no imagination to find the necessary psychological coercion. The petitioner's description of his condition as being "all turned around" is understatement. His revulsion at the prospect of being compelled to view the repulsive product of his handiwork would overcome a stronger will than his. This court cannot escape the

conclusion that the admission into evidence, over objection, of the testimony of the three officers with reference to the oral confession, was in derogation of the petitioner's constitutional rights and privileges.

The factual variations in the numerous cases which have been examined by the court are so wide that it is hardly helpful to attempt a comparison with the facts and circumstances in this case. They range all the way from police brutality, or the third degree, through a few hours of intermittent questioning while denying the accused the right to call counsel. The case of Davis v. U. S., 32 F.2d 860 (9 Cir. 1929), presents some striking similarities. Davis (a Klamath Indian), was convicted of first degree murder. On questioning by a special agent of the FBI, he refused to confess his guilt, maintaining self-defense. He was then taken to the morgue in the nighttime and held in the presence of the dead body of the victim. After about three-quarters of an hour, he broke down and confessed. Admission of the confession was held, by the majority of the court, to be in violation of the accused's constitutional rights, and a new trial ordered, the majority Opinion observing (32 F.2d at pp. 863 and 864), "After a somewhat extended investigation of the subject, we have found but a single instance where an officer took a prisoner to the morgue to register the reaction, and in that case the conduct of the officer was well described by an able judge as 'the theatrical, dime-novel folly of an overzealous officer.'" The case has further aptness with reference to the case at bar in that the dissenting judge found the confession to be voluntary by application of the Wigmore test.

■ There remains only to be considered the ultimate disposition of the case. Stevenson is entitled to a trial free of constitutional infirmities—no more and no less. This court is considerably concerned by an expression used in a recent opinion by the West Virginia Supreme Court of Appeals in the case of State ex rel. Banach v. Boles, W.Va., 131 S.E.2d 722, decided July 9, 1963. That case involved a petition in habeas corpus in which the court found that the failure of the State to furnish the petitioner with a transcript of the evidence when, as an indigent, he made timely request for such transcript for the purpose of taking an appeal, was a denial of his rights under the United States Constitution. In disposing of the case, the majority Opinion says, 131 S.E.2d at page 728, "(i)n the absence of any power in this Court to supply such deficiency at this date, the time for appeal having expired, or *to order a new trial*, petitioner is entitled to his release * * *." (Emphasis supplied.)

■ No reason is given for the italicized clause. It may be that the court feels that, in State habeas corpus proceedings, it is limited, in the disposition of the case, to the alternatives expressed in the statute (Code, 53–4–7, Michie's Code, Section 5330) and so abnegates its inherent powers. If this be so, it should have no application when the judgment and sentence is voided by federal court for a denial of a constitutional right and a new trial is afforded as an alternative to release, in compliance with the constitutional mandate. Certainly, the inhibition adopted by the Supreme Court of Appeals cannot be on the theory that a new trial would constitute double jeopardy, see, e. g., U. S. ex rel. Jones v. Nash, 8 Cir., 264 F.2d 610 and the annotation in 97 A.L.R. 160.

■ Be that as it may, it is the duty of this court to order the release of Stevenson and to stay the execution of the order for a reasonable time to permit the State, if it can, to afford Stevenson a new and constitutionally unexceptional trial. Counsel will be heard at their earliest convenience, not later than September 12th, on the question of fixing such reasonable time.