THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v HARRY WASHINGTON, Appellant.

Second Department, May 21, 1979

## APPEARANCES OF COUNSEL

*William E. Hellerstein (Carolyn Fuentes* of counsel), for appellant.

*Eugene Gold, District Attorney (Laurie Stein Hershey* of counsel), for respondent.

## OPINION OF THE COURT

Rabin, J.

The defendant stands convicted of criminal possession of a weapon in the third degree. The only issues which warrant discussion are: (1) whether it was improper to allow the prosecutor to use previously suppressed unsworn oral

statements for the purpose of impeaching the defendant's credibility where, after a *Huntley* hearing, the court found that it had neither been established that *Miranda* warnings were given nor that the statements were made; and (2) whether the court's failure to fully instruct the jury that the rebuttal testimony could only be considered for purposes of testing the defendant's credibility requires this court to exercise its discretion in the interest of justice and order a new trial. Both inquiries should be answered in the negative.

On the evening of June 6, 1975 the police were summoned to the home of the defendant and his now estranged wife. She ushered the police into the living room where they found the defendant asleep on the couch with the handle of a gun protruding from his pants pocket. A police officer removed the gun, checked to see whether it was loaded, awakened the defendant, and placed him under arrest.

After his arrest, the defendant allegedly made two statements concerning how he came to have the gun on his person. The first statement was to the effect that he had found the weapon in a car that evening before returning home from work. The second statement was to the effect that his wife had planted the gun in his pocket.

The defendant sought a *Huntley* hearing on the issue of whether the oral statements were "made in violation of the defendant's Constitutional rights." The only witness to testify at the hearing was the arresting officer to whom the defendant had allegedly made the statements. After extensively cross-examining the officer, defense counsel argued that the officer's testimony that the statements were made and that the *Miranda* warnings were given, was a blatant fabrication. After further argument and examination, the court (McGrover, J.), found that insofar as the *Huntley* hearing was concerned, the credibility of the police officer had been so impaired that "the People have not established beyond a reasonable doubt that the Police Officer gave the defendant his Miranda warnings; nor have they established that those statements were made by this defendant." Consequently, the statements were suppressed.

At trial the defendant's wife testified that she and her husband had argued on the evening of June 5, 1976; that the defendant left and did not return until the next day; that, upon his return, she believed that he had been drinking; and that when he lay down on the living room couch, she saw a

gun in his pocket. The arresting officer testified that he responded to a radio run by going to the defendant's apartment, where he was let into the house by the defendant's wife. She led him into the living room where he observed the handle of a gun protruding from defendant's pocket.

Prior to the commencement of the defendant's case, the court (SCHOLNICK, J.) ruled that if the defendant testified, the prosecution could use the suppressed statements for purposes of cross-examination. The defendant took the stand in his own behalf and essentially testified that when he returned home he did not have a gun in his possession and that he had made no statements to the police. On cross-examination, the prosecution asked the defendant if he recalled first telling the police that he found the gun in a car, and later telling them that his wife put the gun in his pocket. The defendant denied making any statement to the police. After several more questions concerning statements that the defendant had allegedly made in an interview with the "Pre-trial Services Agency", the court instructed the jury that: "The witness may be questioned about alleged prior statements. These questions are permitted not for the truth of the statement contained therein but the witness may be questioned about inconsistent statements. And it is for you to determine whether these statements are inconsistent. And if they are, it is for you to evaluate that on the issue of the defendant's credibility and not as to the truth of those particular statements."

After some further examination the defense rested. The prosecution recalled the arresting officer as a rebuttal witness for the purpose of impeaching the defendant's credibility. At this time, no cautionary instruction was given or requested. This witness was extensively cross-examined along the same lines as at the *Huntley* hearing.

The court gave a fairly complete charge, including the proper instruction that a police officer is not entitled to any greater degree of credibility than any other witness. The court also charged on the introduction of prior statements as follows: "Now, in connection with the admission into evidence or [sic] prior statements made by witnesses, I instruct you that a witness may be cross-examined about prior statements * * * I caution you, however, these prior statements are not evidence of facts therein contained nor received for their truth. Questions are permitted only for the purpose of impeaching the credibility of the witnesses and thereby discrediting his testi-

mony by alleged prior inconsistent statements * * * You, the jury, must determine whether there are any inconsistencies in the prior statement. If you find in the prior statement there are inconsistencies or contradictions with the trial testimony, you must determine whether the reasons or explanations for the inconsistencies were explained to your satisfaction and, if not, what effect this has on the credibility of the witnesses." However, the court failed to give any express charge on the effect of rebuttal testimony. No such charge was requested, nor was any exception taken to the failure to so charge.

The jury engaged in lengthy deliberations which were interrupted several times to have certain testimony reread and to have aspects of the charge on reasonable doubt and possession clarified. After reporting itself deadlocked, a supplemental charge was given and the jury finally returned with a verdict of guilty. At no time did the jury request a rereading of the defendant's testimony or the rebuttal testimony, or a further charge as to the effect of prior inconsistent statements.

■■ It is indisputable that involuntary confessions may not be used as evidence in chief against a criminal defendant. This conclusion is founded in the dual guarantees of the Fourteenth Amendment right to due process and the Fifth Amendment right against self incrimination (*Jackson v Denno,* 378 US 368 [US Const, 14th Amdt]; *Miranda v Arizona,* 384 US 436 [US Const, 5th Amdt]). The Fourteenth Amendment excludes those confessions which are involuntary because they resulted from duress or coercion. The Fifth Amendment excludes those confessions which are involuntary because they were not made knowingly, i.e., in the absence of *Miranda* warnings. Confessions which resulted from coercion or duress are suppressed for all purposes (*Mincey v Arizona,* 437 US 385). However, confessions which are suppressed because they were not knowingly made, may nevertheless be used to test the credibility of the defendant by means of impeachment (*Harris v New York,* 401 US 222).

■ The *Harris* case *(supra)* questioned the propriety of using a written confession obtained in contravention of the strictures of *Miranda (supra)* for purposes of impeachment. In upholding such use, the United States Supreme Court reasoned that "[t]he shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances" (*Harris v New York, supra,* p 226). Thus, despite the

suppression of statements because of the application of the Fifth Amendment, if a defendant chooses to testify, he is subject to all the "traditional truth-testing devices of the adversary process" *(Harris v New York, supra,* p 225).

The rationale allowing use of suppressed statements for purposes of impeachment has been logically extended to suppressed oral statements. In *People v Wise* (46 NY2d 321), the Court of Appeals relied on traditional formulations of using prior inconsistent statements as a principal means of testing a witness' credibility in holding that a defendant could be impeached by the use of suppressed oral statements. The use of such statements assists the jury in its fact-finding role and thereby advances the truth-seeking process. In context of whether there need be a direct contradiction between the trial testimony and the prior statement, Chief Judge COOKE (then an Associate Judge) stated that "[i]n case of doubt, therefore, the balance should be struck in favor of admissibility, leaving to the jury the function of determining what weight should be assigned the impeachment evidence" *(People v Wise, supra,* p 327).

In light of the Court of Appeals determination in *People v Wise (supra),* there is no question that it was proper to use the defendant's alleged statements concerning how he came to possess the gun as a means of evaluating his credibility. In *Wise,* as here, the question of whether Wise had actually made the prior statement was "an issue of much vigorous dispute, the alleged remark having been made without the benefit of other witnesses and appellant, of course, having denied it at the trial" *(People v Wise,* 60 AD2d 921, 922). In *Wise,* the statement was suppressed because *Miranda* warnings were not given. Here, Criminal Term concluded that the credibility of the police officer had been so impaired that the prosecution had failed to establish beyond a reasonable doubt that the officer had given *Miranda* warnings. This finding results only in prohibiting the introduction of the statements on the prosecution's case in chief and is irrelevant to the use of the statements for impeachment. The latter use is governed solely by the rules pertaining to prior inconsistent statements.

The appellant has argued that since Criminal Term also found that the prosecution had not proven that he had made the statements, they should have been suppressed for all purposes. This contention does not comport with the history and limited purposes of a *Huntley* hearing and, therefore, it

must be concluded that any finding as to whether the defendant actually made the statements was merely gratuitous and of no legal effect.

As previously noted, a conviction cannot be upheld if it is even partly based on an involuntary confession. To the extent that the concept of voluntariness has been expanded by *Miranda v Arizona* (384 US 436, *supra)* and its progeny, there is no question that statements so suppressed may nevertheless be used to test the credibility of an accused person who testifies *(Harris v New York,* 401 US 222, *supra; Oregon v Hass,* 420 US 714; *People v Wise,* 46 NY2d 321, *supra).* Therefore, our inquiry is limited to those confessions which are involuntary by application of the due process clause of the Fourteenth Amendment.

In speaking of the applicability of that amendment in determining the admissibility of a confession, Mr. Justice FRANKFURTER wrote *(Rogers v Richmond,* 365 US 534, 540-541): "Our decisions under that Amendment have made clear that convictions following the admission into evidence of *confessions which are involuntary, i.e., the product of coercion, either physical or psychological,* cannot stand. This is so not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth. See *Chambers v. Florida,* 309 U.S. 227; *Lisenba v. California,* 314 U.S. 219, 236; *Rochin v. California,* 342 U.S. 165, 172-174; *Spano v. New York,* 360 U.S. 315, 320-321; *Blackburn v. Alabama,* 361 U.S. 199, 206-207." (Emphasis supplied.)

The above approach replaced the prior standard of testimonial trustworthiness which allowed the admission of any confession which was reliable. The question of reliability was resolved by reference to the truth or falsity of the statement.

In discussing the transition from the standard of trustworthiness to the due process standard of voluntariness, Wigmore cites the Federal District Court's opinion in *Stevenson v Boles* (221 F Supp 411, affd 331 F2d 939, mod 379 US 43 [3 Wigmore, Evidence (Chadbourn rev), § 822, n 21]). In that opinion it is noted that prior to the application of the due process clause, "the admissibility of pre-trial confessions is a rule of

evidence directed, as are other rules of evidence, at the trustworthiness of the confession as evidence" *(Stevenson v Boles,* 221 F Supp 411, 415, *supra).* The test of trustworthiness was whether there was a risk of a false confession. Regardless of questions of duress or coercion, if the reliability of the statement could be demonstrated by the use of scientifically proven means or other evidence, then the statement would still be admissible. The *Stevenson* court then traced the development of the present exclusionary rule and determined that the test of testimonial trustworthiness was impermissible. Rather, the proper test was whether the accused was " 'involuntarily impelled to make a statement, when but for the improper influences he would have remained silent' " *(Stevenson v Boles, supra,* p 416, citing *Bram v United States,* 168 US 532, 549). The court continued by stating (p 416) that *"[i]t is clear also that the fact that the defendant denies having made the confession has no bearing on its admissibility or inadmissibility,* see, e.g., *Lee v. Mississippi,* 332 U.S. 742". (Emphasis supplied.)

The *Lee v Mississippi* case (332 US 742, 742-743, *supra)* addressed the issue of whether a "defendant in a state criminal proceeding lose[s] the right to contend that a confession was coerced because of his testimony that the confession was in fact never made". The Supreme Court of Mississippi had determined that although there appeared to be an improper element of coercion, since the defendant steadfastly denied having made the confession, he could not challenge its voluntariness (201 Miss 423). The Supreme Court of the United States reversed and held that the accused is not so estopped because the due process clause "invalidates a state court conviction grounded in whole or in part upon a confession which is the product of other than reasoned and voluntary choice. A conviction resulting from such use of a coerced confession, however, is no less void because the accused testified at some point in the proceeding that he had never in fact confessed, voluntarily or involuntarily" (332 US 742, 745, *supra).*

The court further stated (p 745): "His alleged denial of the confession went only to the original issue of whether he actually made the confession, an issue that is no longer open. That question was at most a disputed one; but the jury resolved the matter against petitioner and, like the court below, we accept that determination. The sole concern now is

with the validity of the conviction based upon the use of the oral confession."

Upon reversing the judgment of conviction, the United States Supreme Court remanded the case to the State court solely for a determination of whether the confession was involuntary because it was coerced. The responsibility of evaluating the defendant's denial of having made the statement was left to the jury. By expressly limiting the scope of the hearing on voluntariness to issues of coercion, the Supreme Court necessarily refused to expand the traditional meaning of voluntariness under the due process clause to include the issue of whether the defendant had in fact made the alleged confession.

An accused's denial of having made a statement is entirely irrelevant to the question of admissibility. Rather, such a denial is pertinent only to the jury's function of evaluating credibility in its search for truth. Factual questions involving credibility of witnesses and the weight of evidence are traditionally in the exclusive province of the jury. Although New York has not entirely rejected the concept of trustworthiness as a factor affecting admissibility, the continued import of trustworthiness is the question of volitional competency (*People v Schompert,* 19 NY2d 300, cert den 389 US 874). However, neither volitional competency, nor any other standard of trustworthiness, is concerned with whether an accused in fact made the challenged statement. Rather, volitional competency involves a rule of evidence which merely reaches the question of whether there were circumstances, e.g., intoxication, which make it likely that the confession was not reliable. However, this evidentiary determination does not invade the jury's function of weighing evidence and evaluating credibility.

The dissent's suggestion that an accused's denial of having made an admission is a proper subject of inquiry at a *Huntley* hearing, cannot be accepted. There is no support for such a conclusion. The New York requirement of a pretrial hearing to determine the admissibility of a confession (i.e., a *Huntley* hearing) stems from the Supreme Court's opinion in *Jackson v Denno* (378 US 368, *supra).*

The *Jackson* case involved a confession which appeared to be obtained in circumstances of physical duress. Pursuant to prior New York procedure, the issue of voluntariness was submitted to the jury. This procedure was found to violate due

process because it improperly injects "impermissible considerations of truthfulness of the confession into the assessment of voluntariness" (p 386). The court emphasized that any question of truth or falsity is wholly irrelevant to the question of admissibility, which must be determined solely on the basis of voluntariness, i.e., coercion *(Rogers v Richmond,* 365 US 534, *supra)*. A pretrial hearing is also required to insure that a coerced confession will not influence the jury and thereby be used against the accused *(Jackson v Denno, supra,* p 389).

There is nothing in the *Jackson* opinion which expands the scope of voluntariness beyond the usual definition of coercion and duress. Thus, even under *Jackson v Denno (supra),* the three pronged inquiry of voluntariness (i.e., [1] "the external, 'phenomenological' occurrences and events surrounding the confession", [2] the imaginative re-creation of internal psychological fact, and [3] the application of legal standards and factual circumstances to the psychological facts *[Culombe v Connecticut,* 367 US 568, 603]) necessarily presumes that the statement was made, until the final and exclusive resolution of this issue by the jury. Consistent with this approach is the decision in *Woody v United States* (379 F2d 130, cert den 389 US 961), wherein the court held that it was proper not to have conducted a suppression hearing where the accused merely denied making the alleged confession and raised no question of voluntariness.

No persuasive reason has been advanced why we should expand the intended scope of a suppression hearing to require the determination of whether an accused in fact made the alleged confession. Such a determination is peculiarly a function of credibility and absent any question of improper conduct in obtaining a confession, there are no compelling reasons for excluding a statement purportedly made by an accused. The question of whether the alleged statement was made is an integral part of the truth-testing function and to remove it from the jury would be antithetical to the fundamentals of our system of jurisprudence.

In the present case, the decision at the *Huntley* hearing necessarily involved an evaluation of credibility in the determination of whether *Miranda* warnings were given. However, no further determination was either necessary or proper. Not only was suppression ordered on the basis of a *Miranda* violation, but Criminal Term expressly qualified its evaluation of credibility to the purposes of that hearing. In these circum-

stances, it was entirely proper to introduce the statements for impeachment purposes.

■ There is no question that the trial court failed to give adequate instructions concerning the use and effect of rebuttal testimony (see *People v Boone,* 56 AD2d 892). Although this error could have been easily obviated or cured by a timely protest, the defendant failed to either request a proper charge or to object to the charge as given. Consequently, no question of law has been preserved for appellate review (see CPL 470.05, subd 2). Nor is this an appropriate case to exercise our discretion to order reversal in the interest of justice (cf. CPL 470.15). The evidence of guilt is strong and the harm which may have resulted from the error was minor and had little causal effect on the actual verdict (see *People v Musolino,* 54 AD2d 22, cert den 430 US 935; cf. *People v Sovie,* 54 AD2d 784).

Two eyewitnesses, the defendant's wife and the arresting officer, testified that they observed a gun in the defendant's pants pocket. Since it is uncontested that the defendant had been previously convicted of a crime, nothing more was necessary to establish the defendant's guilt (see Penal Law, § 265.05, subd [1]; § 265.02, subd [1]). On his direct testimony, the defendant did little more than deny that he had the gun in his possession when he entered the house. In view of the defendant's testimony, it is noted that the introduction of the second statement, i.e., that his wife planted the gun, is, if believed, consistent with the thrust of his testimony and is exculpatory. If the gun had been planted, it would constitute "innocent possession" which may be a basis for acquittal, even though intent is not a necessary element of the crime charged (cf. Penal Law, § 265.01, subd [1]; *People v Trucchio,* 47 AD2d 934). If the statement was not believed, then it only affects the defendant's credibility, for which purpose it was properly introduced.

The other statement, i.e., that he found the gun, is inculpatory and, if believed, could be of some prejudice. However, in the circumstances of this case, it is unlikely that any such prejudice occurred. The court timely instructed the jury that this and the other statement were being introduced only on the issue of the defendant's credibility. Furthermore, although the court gave no charge regarding the rebuttal witness, it gave a fairly complete charge that the statements could be used only in evaluating credibility. The court also gave a

complete charge on the credibility of police officers. This is noteworthy because the officer called as a rebuttal witness was extensively cross-examined.

In view of the above circumstances, there is no doubt that the defendant received a fair trial and that the properly admitted evidence fully supports the guilty verdict. Any harm resulting from the failure to charge on rebuttal testimony was minor. The lengthy deliberations indicate that the jury weighed the evidence carefully and it is significant that in none of their requests did the jury refer to the statements or the rebuttal testimony. The instant record and applicable legal principles do not justify interfering with the judgment of conviction and, therefore, there should be an affirmance.

We note that we have considered the other arguments raised on appeal and find them to be without merit.

O'CONNOR, J. (dissenting). Defendant appeals from a judgment convicting him, upon a jury verdict, of criminal possession of a weapon in the third degree. Inculpatory statements, allegedly made by defendant after his arrest, were used to impeach his credibility at trial despite the finding of the trier of fact at an earlier hearing conducted pursuant to the dictates of *People v Huntley* (15 NY2d 72), that the People had failed to establish beyond a reasonable doubt that defendant received *Miranda* warnings or that he made any statements. The use of the suppressed statements for any purpose denied defendant a fair trial, and a reversal is required. Assuming, *arguendo,* that the alleged statements could have been used for impeachment purposes, the charge to the jury governing the use of the disputed statements was inadequate and constitutes an independent basis for reversing the conviction.

## THE FACTS

The factual issues presented to the jury in this case were simple and their resolution revolved primarily upon questions of credibility. On June 6, 1975 Police Officer Caracappa received a radio run indicating that there was a report of a man with a gun in a specified apartment at 2729 West 33rd Street in Brooklyn. Upon his arrival at the scene, Caracappa was let into the apartment by Gertrude Washington, defendant's wife. Defendant was found sleeping on a living room couch with a gun handle protruding from his pants pocket. After removing the gun, Caracappa roused defendant and arrested him.

A *Huntley* hearing was conducted on May 17, 1976. Officer Caracappa testified that he had properly advised defendant of his *Miranda* rights and that soon thereafter defendant told him that he had found the gun in a parked car on "29th Street and Mermaid Avenue". The officer further testified that approximately two hours later, while at the 84th Precinct, defendant altered his story and claimed that his wife had planted the gun on him while he slept. On cross-examination, however, Caracappa's credibility was seriously impaired when he was forced to admit that at a preliminary hearing conducted on June 9, 1975 he had testified under oath that defendant had not made a statement at the time of his arrest and that on his written report he had affirmatively indicated that defendant had not made a statement. In light of these troubling and glaring inconsistencies, Mr. Justice McGROVER found at the termination of the hearing as follows: "the Court finds that the People have not established beyond a reasonable doubt that the Police Officer gave the defendant his *Miranda* warnings; *nor have they established that those statements were made by this defendant"* (emphasis supplied).

At the trial, presided over by Mr. Justice SCHOLNICK, Officer Caracappa testified to the circumstances which led to his arrest of defendant. Gertrude Washington, now defendant's estranged wife, testified that prior to June 6, 1975 she had been having arguments with her husband and on occasion he had struck her. On the evening of June 6 appellant came home, apparently "high" or "drunk", and fell asleep on the couch. At this point she noticed the gun in his pocket. Sarah Spencer, Gertrude's sister, who had lived with the Washingtons for several months prior to this incident, also saw the gun but left before the police arrived.

Defendant testified in his own behalf. On the evening in question he came home to visit his children but fell asleep on the couch. He did not have a gun when he entered the apartment and only became aware of its existence when awakened by Caracappa. He had made no statement to Caracappa when arrested. He had previously argued with his wife about Sarah Spencer's presence in the apartment, and Sarah had been in the apartment when he arrived on June 6.

Over strenuous objection, the Trial Judge ruled that pursuant to *Harris v New York* (401 US 222) defendant could be cross-examined about the inconsistent statements allegedly made to Caracappa. The prosecution was permitted to ask

defendant whether he had ever told Caracappa that he found the gun in a car on Mermaid Avenue or that his wife had planted the gun on him. When defendant denied making any such statements Caracappa was recalled as a rebuttal witness, repeated his *Huntley* hearing testimony, and was cross-examined in the same manner as before. At this time the court failed to instruct the jury that any previous inconsistent statements that they might find were made by defendant could not be utilized by them as evidence of guilt, but were admitted solely to impeach his credibility. In fact, only after the summations did the jury receive instructions on the role of prior inconsistent statements, and specific instances of inconsistent testimony were referred to only insofar as Caracappa's testimony was concerned.

The jury had great difficulty in reaching a verdict. They retired to deliberate at approximately 12:30 P.M. on February 17, 1977 and, after being sequestered overnight, found defendant guilty at approximately 4:10 P.M. on February 18. On two separate occasions the jury reported itself hopelessly deadlocked and a verdict was reached only after supplemental instructions were given.

### THE LAW

Any analysis must begin with a determination of whether Mr. Justice McGROVER was acting within the scope of his authority when he made a factual determination that the People had failed to establish beyond a reasonable doubt that defendant had made any statements to Caracappa. Both case law and simple logic dictate the conclusion that, at a *Huntley* hearing, the trier of the facts, in order to properly weigh the voluntariness of an admission, has the inherent and ineradicable right to determine whether the challenged admission was ever made. If it be determined that the alleged statement was, in fact, never made, it patently follows that it may not be referred to, for any purpose, at the subsequent trial.

In *Jackson v Denno* (378 US 368), the Supreme Court of the United States issued the ruling which led to the New York Court of Appeals decision in *People v Huntley* (15 NY2d 72). In *Jackson (supra),* the then existing *voir dire* procedure for determining the voluntariness of a confession was ruled to be a denial of due process. It was there clearly stated that a conviction cannot be predicated, in whole or in part, upon a coerced confession, regardless of its truth, and that the New

York procedure at issue inevitably injected irrelevant and impermissible considerations of truthfulness of the confession into the assessment of voluntariness. Furthermore, a danger existed that a confession found to be coerced played some part in the jury's deliberations. The court in *Jackson* then stated (p 380): "A defendant objecting to the admission of a confession is entitled to a fair hearing in which *both the underlying factual issues* and the voluntariness of his confession are actually and reliably determined" (emphasis supplied).

The landmark New York case of *People v Huntley (supra)* followed closely upon the heels of *Jackson.* The Court of Appeals stated (p 78) that " 'the jury passes on voluntariness only after the judge has fully and independently resolved the issue against the accused' " and then went on to suggest (p 78) that "[t]he Judge must find voluntariness beyond a reasonable doubt before the confession can be submitted to the trial jury."

When, as here, a defendant denies having made *any* statement and claims, in the alternative, that any statement made was extracted from him involuntarily, it is at least plausible for the trier of fact to rationally and reasonably conclude that although precise and proper *Miranda* warnings were given, the defendant never made a single admission to his interrogator. The scope of a *Huntley* hearing should therefore allow for such a determination because, as noted in *Jackson (supra,* p 380), "the underlying factual issues" must be determined *before* voluntariness can be found. The concept of voluntariness does not exist in a vacuum. Rather, it must attach to some deed or action, in this instance the act of confession. Absent a finding that a confession was indeed made, voluntariness becomes a moot issue, and, as *Huntley* makes clear, the confession cannot be submitted to the jury when voluntariness is not found.

In *Harris v New York* (401 US 222, *supra)* and *Oregon v Hass* (420 US 714), the United States Supreme Court permitted the use of inculpatory statements solely for impeachment purposes where the strictures of *Miranda v Arizona* (384 US 436) had been violated. In *Harris (supra,* p 225), the court noted that a *Miranda* violation does not open the door to the defendant to "commit perjury" and hence it does not prohibit the use of a statement for impeachment purposes. However, it added the clear caveat that its ruling applied only if "the trustworthiness of the evidence satisfies legal standards" (p

225). We find that thought echoed in *Oregon v Hass (supra,* p 722), where the court said: "We are, after all, always engaged in a search for truth * * * so long as the search is surrounded with the safeguards provided by our Constitution."

The doctrine of *Harris* and *Hass* was recently extended by *People v Wise* (46 NY2d 321) to embrace, for impeachment purposes, an unverified oral statement which the defendant, on cross-examination, denied making. The Court of Appeals reversed an order of this court and held that impeachment on rebuttal was proper and fully consistent with a liberal use of prior inconsistent statements. But the case at bar is clearly distinguishable from *Wise,* which involved simply a denial by the defendant that he made the statement. A question of credibility was thus presented for the jury. Here a court, following a hearing, made a finding that the People had failed to establish that the statement had in fact been made. There the issue of trustworthiness was not directly before the court. Here it is the principal issue. It should be noted that the trustworthiness of a statement in this context refers not only to volitional competency (whether *Miranda* was observed) but, of equal importance, to whether a statement was in fact ever made (the scope of a *Huntley* hearing). The basic principle that an involuntary statement cannot be used at all at trial has long since been reaffirmed *(Mincey v Arizona,* 437 US 385) and it would seem to make small sense and little logic to permit impeachment proceedings predicated upon a fabricated confession and to deny it when based upon a coerced one! *Harris, Hass* and *Wise (supra)* have no applicability where the People fail to establish by legal standards that an inculpatory statement has in fact been made. Under the facts here disclosed, the use for impeachment purposes of the alleged statements was a violation of due process and denied defendant a fair trial. The judgment should be reversed and a new trial should be conducted.

By any standard, even if the alleged statements were admissible for impeachment purposes, a reversal is still mandated because the charge given to the jury as to the limited purposes for which the statements were admitted was totally inadequate. At the time that Officer Caracappa offered his rebuttal testimony the court failed to promptly instruct the jury that this testimony could be used for impeachment purposes only. Furthermore, the charge on the use of prior inconsistent statements did not clearly apprise the jury that

such statements were not to be considered as evidence of guilt. The People concede the inadequacy of the charge but consider it *de minimis.* I hold that because of this error a reversal is required (see *People v Patterson,* 48 AD2d 933; *People v Boone,* 56 AD2d 892), even though defendant failed to properly object, because of the seriously prejudicial nature of the error (see *People v Campbell,* 59 AD2d 912).

In conclusion, it is noted that the People contend that the use of the alleged statements did not contribute at all to defendant's conviction and should therefore be deemed harmless. This argument merits little discussion. The prosecutor relied heavily on the use of the inconsistent statements in his summation, arguing that they evidenced defendant's consciousness of guilt. In a case that revolved almost entirely around the issue of credibility, and in which the jury twice reported itself deadlocked, it cannot be said that there was no reasonable possibility that the admission of the evidence contributed to the conviction or that the error was harmless beyond a reasonable doubt (see *People v Almestica,* 42 NY2d 222; *People v Crimmins,* 36 NY2d 230).

DAMIANI, J. P., and GULOTTA, J., concur with RABIN, J.; O'CONNOR, J., dissents and votes to reverse the judgment and order a new trial, with an opinion.

Judgment of the Supreme Court, Kings County, rendered April 12, 1977, affirmed.