THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
RONALD H. KROM, Appellant.

Third Department, January 6, 1983

APPEARANCES OF COUNSEL

*Gary Greenwald* for appellant.

*Stephen F. Lungen, District Attorney,* for respondent.

**OPINION OF THE COURT**

LEVINE, J.

On May 24, 1977 at approximately 5:00 P.M., Roger Farber and a business associate entered the Farber home and encountered an armed, masked person, who forced them to lie down and then bound their hands and feet. Shortly thereafter, Gertrude "Trudy" Farber, Roger's wife, arrived home and was abducted by the intruder. Roger notified the FBI and his father-in-law, Harry Resnick, who in turn called the State Police. In their initial investigation, the police received a description by neighbors of an orange colored automobile parked behind the Farber home when the crime took place, and they discovered a tire tread mark at the reported location of the vehicle. A plaster cast was made of the tread mark. The police placed a consent wiretap upon the telephone at the Resnick residence, and at 6:30 P.M. on the evening of the abduction they monitored a call to the victim's father in which a ransom demand of $1,000,000 was made. The following evening Roger Farber answered the telephone at the Resnick residence. The caller asked to speak to Resnick and then immediately hung up when Farber identified himself. However, Farber recognized the voice and, based upon numerous previous contacts, identified defendant as the caller. State Police investigators then went to defendant's residence where they observed an orange vehicle in the garage having a tire

tread similar to the plaster cast of the tread mark discovered earlier. When defendant emerged from the residence, the police advised him of his *Miranda* rights, of the purpose of their presence, and of the known facts linking him with Trudy Farber's disappearance. Defendant responded that he might have information concerning the victim's whereabouts, but wanted $400,000 in exchange for his co-operation. Defendant at that point attempted to leave, but was prevented from doing so by the officers, who then took him to the Ferndale State Police barracks. Upon arrival there, defendant asked to speak to the victim's father and admitted making the first ransom call to Resnick and the second call to his residence that Roger Farber answered. At various times during the interrogation, defendant both admitted and denied knowing the whereabouts of the victim. When he attempted to leave the barracks, he was restrained and advised that he was formally under arrest. Defendant then asked to be permitted to contact a lawyer in Florida, and when told that this was impractical, he requested Warren Lagarenne, a local attorney who had previously represented his family. All interrogation then ceased. When Lagarenne arrived at the Ferndale barracks, he spoke privately to defendant, but they could not agree upon a fee. Lagarenne then left, after advising the police that he would not be representing defendant and suggesting that Legal Aid be contacted. When the police offered to contact Legal Aid, defendant declined, stating that he wished to act as his own attorney. Discussions resumed, with the police concentrating on obtaining information on the location of the victim and defendant refusing to give information unless his demands for money were met. Finally, when defendant said he would only talk to Resnick and give information only if Resnick provided him with $10,000 cash and $10,000 for legal fees, Resnick was called in to speak to defendant and agreed to defendant's terms. Defendant then led the police to a secluded wooded area, removed leaves covering the door to a wooden box buried in the ground, and pulled open the door to reveal the body of the deceased victim. Defendant was brought back to the Ferndale barracks and gave further details of the kidnapping, but maintained that the real culprit was the victim's

husband. He was next brought before a Town Justice for arraignment and declined to accept appointment of counsel. He was ordered committed to the Sullivan County Jail, and on the way there, made a full confession. Following his indictment, the Sullivan County Legal Aid Society was assigned to represent him. In separate hearings held in June and December, 1978, defendant was determined to be incompetent to stand trial. A third such hearing was held in February, 1979, following which the court ruled that defendant was competent to stand trial. Next, a suppression hearing was held, during which defendant was represented by Legal Aid counsel, Carl J. Silverstein. Near the completion of that hearing, however, defendant made a formal written application to dismiss the Legal Aid Society and to be permitted to proceed *pro se*. The court, however, was successful in persuading defendant to permit Silverstein to conclude the suppression hearing. Prior to the commencement of the trial, defendant persisted in his request that he be permitted to represent himself, and after hearing him and Silverstein, the court granted permission, although Silverstein was directed to attend the trial and to confer with defendant as his legal advisor. Thereupon, the trial commenced, and defendant acted as his own attorney through the selection of the jury, opening statements, the entire testimony of the first of the prosecution's witnesses, and part of the cross-examination of the second prosecution witness. At this point, the court declared that by repeated disregard of its instructions and admonitions on his courtroom conduct, defendant had forfeited his right to represent himself, and it directed Mr. Silverstein to take over the defense, which he did throughout the balance of the trial. The jury returned a verdict convicting defendant of three counts of murder in the second degree, two counts of kidnapping in the first degree, and one count of burglary in the second degree. This appeal then ensued.

■■ The first issue to be addressed is the admissibility of the various inculpatory statements made by defendant, beginning with his remarks to the police at their initial contact at his home and ending with his confession following his arraignment while being driven to the Sullivan

County Jail. We agree with the suppression court's findings that defendant was first taken into custody at the point when the police prevented his leaving them at his residence and then took him to the Ferndale State Police barracks. Any earlier statements were thus admissible, since they were not the product of custodial interrogation. When defendant was taken into custody, the police had evidence which was amply sufficient to establish probable cause, namely, (1) the identification of his voice by Roger Farber during defendant's second telephone call to the Resnick home, (2) his possession of an automobile having an orange color and tire treads similar to those of the vehicle observed behind the victim's home at the time of the abduction, and (3) his statement to the police, in response to their initial, noncustodial questioning, that he knew something concerning the victim's whereabouts, but would not divulge any information without being paid a substantial sum of money. There was also more than sufficient evidence to sustain the court's determination that all subsequent statements were made by defendant after he had been advised of his constitutional rights and had voluntarily waived them. The mental competency of defendant to waive his *Miranda* rights was also a question of fact, and there was psychiatric evidence both to substantiate defendant's competency as well as to explain why he could have been competent at the time of his arrest yet found to be incompetent to stand trial upon examination three weeks later (see *People v Love*, 85 AD2d 799, affd 57 NY2d 998). Defendant's competent, voluntary waiver of his *Miranda* rights is dispositive of the challenge to all of his remaining incriminatory statements up to his request for counsel at the State Police barracks on the afternoon of his arrest. Likewise factually supported by the evidence was the finding of the suppression court that defendant's statements made while en route to jail after his arraignment "were not the result of interrogation suggestion or prompting, and were spontaneously volunteered". Hence, those statements were clearly admissible (*People v Maerling*, 46 NY2d 289, 301-303; *People v Kaye,* 25 NY2d 139, 144). Left to be considered are the statements made after defendant requested counsel and conferred with attorney

Lagarenne. The record establishes that as to all such statements, the police scrupulously honored defendant's request to consult with an attorney by refraining from all interrogation until after defendant had consulted with Lagarenne, had rejected their offer to contact Legal Aid when that attorney declined representation, and had expressly indicated that he had decided to act as his own attorney and then his desire to resume negotiations on exchanging information for the payment of money. The foregoing satisfies the requirements for a voluntary, knowing, and intelligent waiver of defendant's right to counsel under the United States Constitution (*Edwards v Arizona,* 451 US 477, 482-487).* Moreover, as to those incriminating statements made up to the point when defendant revealed the body of Trudy Farber, County Court found that the purpose of all police interrogation was more than partly directed toward locating and saving the life of the victim. As such, these statements were admissible under the even stricter New York right to counsel standard, in falling within the missing person investigation emergency exception to the State right to counsel (see concurring and dissenting opinions in *People v Knapp,* 57 NY2d 161). That emergency exception ended, however, once the victim's body was discovered (*People v Knapp, supra; People v Weinman,* 90 AD2d 220). The subsequent statement made in response to police interrogation in the absence of counsel and not on counsel's advice was therefore violative of defendant's New York right to counsel and should have been suppressed (*People v Hobson,* 39 NY2d 479, 484; cf. *People v Beam,* 57 NY2d 241). County Court's failure to suppress that statement, however, does not require reversal here. The jury properly had before it defendant's full confession, later volunteered to the police while en route to jail, all statements prior to the discovery of the body, and the totally damning evidence that it was he who was able to lead the police to the victim's body. At the very most, defendant's statement after discovery of the body was cumulative, and there is not the remotest possibility that

---

* Among other evidence to support this conclusion, the record indicates that defendant specifically requested to see the District Attorney, who refrained from speaking to him until he was again advised of his right to counsel and "told Mr. Gellman [the District Attorney] he would handle the case himself".

its erroneous admission affected the jury's verdict. Thus, the failure to suppress that statement was harmless error beyond a reasonable doubt (*People v Sanders,* 56 NY2d 51, 66-67).

■ We next consider whether it was error for County Court to grant defendant's application to act as his attorney *pro se.* Here, we recognize the delicate nature of the issue before the trial court. On the one hand, an accused has a constitutional right to defend himself, founded in our respect for human dignity and the right of an individual to determine his own destiny, and the denial thereof may require reversal (*Faretta v California,* 422 US 806; *People v McIntyre,* 36 NY2d 10). On the other hand, the dictates of the concept of fair trial place limitations on that right, so that if improperly honored, it, too, may require reversal (*People v Sawyer,* 57 NY2d 12). We decline to impale County Court on the horns of that dilemma in the instant case. Defendant's request was made timely and was unequivocal. In his formal written application, defendant affirmed his awareness of the risks inherent in representing himself due to his lack of legal training. Psychiatric reports to the court substantiated defendant's competency to stand trial. The court conducted a hearing in which it patiently (albeit unsuccessfully) attempted to dissuade defendant from adopting the course he had chosen, and in which defendant reaffirmed his awareness of the disadvantages of proceeding *pro se* and gave assurance that he would conduct himself in an orderly manner and would obey the court's instructions. Thus, the record establishes that defendant's waiver of counsel and election to act *pro se* was competent, knowing, and intelligent, and that all of the other elements required under *People v McIntyre* (36 NY2d 10, 17, *supra*) to support County Court's determination of defendant's application were met (see, also, *People v Reason,* 37 NY2d 351, 354-356). Nor do we find that error was committed in terminating defendant's *pro se* representation. The record discloses numerous instances of the kind of disruptive and obstreperous conduct by defendant to justify the court's determination that he had forfeited his right to act as his own attorney and that it was necessary to relieve him of that status if the trial was ever to be

concluded in an orderly manner (*People v McIntyre,* 36 NY2d 10, 18, *supra*). By the same token, it was not error for the court to deny defense counsel's motion for a mistrial after he was substituted. The grounds for that motion were that the jury was prejudiced against defendant as a result of his conduct of his own defense and that substituted counsel was at that point effectively precluded from asserting a viable insanity defense. Clearly, however, these circumstances were of defendant's own making and flowed directly from his original decision to represent himself. Having made that decision, he is bound by it and "cannot complain of the legal representation he has received at his own hands" (*People v Reason,* 37 NY2d 351, 356, *supra*).

■ Defendant next contends that a reversal is required because of the "dual roles" played by attorney Edward Leopold who was executive director of the Sullivan County Legal Aid Society up to December 23, 1977, when he resigned and shortly thereafter was appointed to the staff of the Sullivan County District Attorney's office. Leopold appeared on defendant's behalf at his arraignment on the indictment and during defendant's first competency hearing. On this issue, the pertinent facts and events have major similarities to those of *People v Shinkle* (51 NY2d 417). In *Shinkle,* the prosecution of the defendant by the Sullivan County District Attorney's office was held to require reversal, despite the fact that Leopold, upon entering the District Attorney's office on January 12, 1978, took effective steps to isolate himself from the prosecution of all pending cases in which he had previously played any role as a Legal Aid attorney, by having "CONFLICT" stickers placed on the files and by an order to members of the District Attorney's staff not to discuss any of the cases with him. The Court of Appeals held in *Shinkle* (p 421) that reversal was required without proof of any prejudice because of "the appearance of impropriety and the risk of prejudice attendant on abuse of confidence, however slight". As pointed out in defendant's brief, upon Leopold's resignation, attorney Carl J. Silverstein succeeded him as executive director of the Legal Aid Society. Silverstein conducted the suppression hearing on behalf of defendant here, acted as defendant's standby counsel, and then re-

placed him as defense attorney at the trial. It is noteworthy that Silverstein also argued the defendant's appeal in *Shinkle.* However, the parallel between the instant case and *Shinkle* regarding Leopold's dual role ends with respect to one salient factor, the making of a timely objection thereto before trial. In *Shinkle* (p 420), disqualification of the prosecutor's office was interposed before the trial, both by the commencement of a special proceeding to obtain relief in the nature of a writ of prohibition and by motion before the trial court. Here, the record is entirely devoid of any objection to the prosecution of the case by the Sullivan County District Attorney's office. This failure may not be ascribed solely to the fact that defendant acted as attorney *pro se*. Attorney Silverstein represented defendant at the hearings immediately before trial and acted as his legal advisor when defendant was conducting his own defense. That attorney's awareness of the conflict of interest arising out of Leopold's position in the District Attorney's office is established beyond peradventure, not only from the circumstances of his succession to Leopold's position at the Legal Aid Society and his role in the *Shinkle* case, but also by the fact that he moved before trial for an order directing Leopold to share all of his knowledge of defendant's case with the Legal Aid Society. Therefore, defendant's failure to move to disqualify the prosecutor's office is clearly subject to the inference that it was the product of counseled, deliberate choice. Since the issue of disqualification of the prosecutor's office was not preserved by timely objection, it may only be considered insofar as it may afford a basis for the exercise of our discretion to reverse in the interest of justice (CPL 470.15, subd 3, par [c]). The record militates against exercise of that discretion in the instant case. As previously indicated, the facts and circumstances support the inference that the failure to interpose an objection was purposeful and not inadvertent. A reversal in the interest of justice would thus be equivalent to "substitution of appellate advocacy for trial strategy", a clearly inappropriate exercise of our discretion (*People v Travison,* 59 AD2d 404, 408, affd 46 NY2d 758, cert den 441 US 949; see, also, *People v Streiff,* 41 AD2d 259, 266, affd 35 NY2d 22). When there has been timely objection to a District

Attorney's conflict of interest, *Shinkle* indeed holds that a reversal is required based merely upon the appearance of impropriety, without a showing of any actual impairment of a defendant's rights. It would be manifestly unfair, however, to apply the same principle here, thus permitting the defense to withhold objection and raise the issue for the first time on appeal after obtaining an unfavorable result at the trial. There is not a scintilla of evidence that any breach of defendant's confidence occurred or that there was any other actual prejudice arising out of Leopold's position in the District Attorney's office. Defendant received as fair a trial as was humanly possible under the circumstances of the case, which were of his own creation, and the proof of guilt was overwhelming. Therefore, he has failed to establish a proper basis for reversal in the interest of justice (*People v Washington,* 68 AD2d 90, 100-101, affd 51 NY2d 214; *People v Musolino,* 54 AD2d 22, 26, cert den 430 US 935).

We have examined defendant's remaining assignments of error and find them to be without merit. Defendant's conviction should therefore be affirmed in all respects.

SWEENEY, J. P., KANE, CASEY and YESAWICH, JR., JJ., concur.

Judgment affirmed.