THIRD DEPARTMENT, JANUARY, 1986

(January 2, 1986)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOEL FERKINS, Appellant.—Weiss, J. Appeal from a judgment of the County Court of Sullivan County (Scheinman, J.), rendered May 31, 1983, upon a verdict convicting defendant of the crimes of murder in the second degree (three counts), burglary in the first degree (one count), sodomy in the first degree (one count) and criminal possession of a weapon in the first degree (one count).

Defendant was convicted as indicated above after a jury trial resulting from the April 22, 1982 slaying of 15-year-old

Michele Wilkinson, whose body was found in her home in the Town of Wurtsboro, Sullivan County. The victim had been sexually assaulted and repeatedly stabbed with a kitchen knife. Defendant was sentenced as a second felony offender to concurrent prison terms of 25 years to life on each count of murder in the second degree; concurrent prison terms of 12½ to 25 years on each of the burglary and sodomy convictions, to run consecutive to the intentional murder sentence; and a consecutive prison term of 3½ to 7 years on the possession conviction. This appeal ensued.

Defendant maintains that his oral statements should have been suppressed as the product of an illegal detention (see, *Dunaway v New York*, 442 US 200). We disagree. As a result of their investigation, the State Police learned that defendant's vehicle, a red Chevrolet Nova, matched the description of a vehicle observed in the vicinity of the Wilkinson home at the time of the slaying. On April 26, 1982, the State Police obtained a warrant to search that car. At about 2:15 P.M., that day, defendant was stopped by a State trooper while driving the car toward an entrance ramp of Route 17. Several investigators pulled up behind defendant's vehicle after he was stopped. In addition to executing the search warrant, the police were instructed to request defendant to accompany them to the State Police barracks in Ellenville to be interviewed concerning an investigation involving the Nova. The suppression court found that defendant acceded to a request that he return to the police barracks for the interview. When asked if he knew the purpose of the stop, defendant replied that it "is probably about the death of the girl in Wurtsboro". He was then advised of his *Miranda* rights and reiterated his willingness to accompany the police.

Although defendant admits the initial stop of his vehicle was permissible for purposes of conducting a brief inquiry, he argues that he was seized without probable cause and had no alternative but to cooperate. The issue distills to whether defendant voluntarily accompanied the police. The police officers confirmed that defendant was calm and volunteered to cooperate, stating that it was "no problem". Defendant was well acquainted with the criminal justice system from his criminal background. He admitted no guns were drawn, no handcuffs used, that he expected the police would eventually question him and that he agreed to accompany them. There is no evidence of coercion. The suppression court's finding of consent is amply supported and denial of the motion to suppress on this basis was proper (see, *People v Baird*, 111

AD2d 1044; *People v Hopkins,* 86 AD2d 937, 938, *affd* 58 NY2d 1079).

We also find that defendant's statements at the police barracks later that evening were voluntarily made. Upon arrival, defendant was asked to account for his activities on April 22, 1982. When later advised that discrepancies appeared in his story, and that his car had been seen in Wurtsboro on that day, defendant admitted for the first time that he had been in the area. Investigator Ronald Keillor testified that he reissued *Miranda* warnings at about 7:30 P.M., and that defendant indicated he understood those warnings. The officer then told defendant a positive identification had been made, whereupon defendant began to cry and stated, "I need help. I need help * * * I didn't mean to hurt her. I don't want to go to jail." As the interview continued, defendant admitted that he gained entry through the door and obtained a knife "there". He further stated that "she was dirty and * * * had to be cleansed". According to Keillor, whose testimony was accepted by the suppression court *(see, People v Williams,* 114 AD2d 683), defendant was emotionally upset but did not request the assistance of counsel or otherwise attempt to discontinue the interview. Given the totality of the circumstances, we find beyond a reasonable doubt that these statements were voluntarily made *(see, People v Anderson,* 42 NY2d 35, 38-39; *People v Gloskey,* 105 AD2d 871, 872).

We do agree with defendant's assertion that statements taken at the victim's home en route to arraignment were improperly admitted into evidence. After the Keillor interview terminated at approximately 10:30 P.M., defendant was prepared for transfer to Wurtsboro for arraignment before a local Town Justice. During this process, defendant suddenly attacked one of the officers. It is acknowledged that defendant may have been injured while being subdued. En route to Wurtsboro, the investigators detoured to the crime scene where they displayed graphic photos of the victim to defendant who, when questioned about his guilt, purportedly acknowledged same by nodding his head. Significantly, no oral responses were made. In our view, there was no plausible reason for the detour. Defendant had already undergone an extensive, difficult interview, had been injured and was being transferred for arraignment purposes only. This unwarranted delay in arraignment, although brief, is a factor to consider as to voluntariness *(cf. People v Van Buren,* 115 AD2d 185; *People v Hopkins, supra,* pp 938-939). Considering the surrounding circumstances, we cannot say that the People proved

the voluntariness of these admissions beyond a reasonable doubt *(see, People v Anderson, supra).* The error, however, must be considered harmless given the cumulative nature of the statements and the clearly voluntary admissions earlier made *(see, People v Sanders,* 56 NY2d 51, 66-67; *People v Krom,* 91 AD2d 39, 44-45, *affd* 61 NY2d 187).

Defendant further contends that the in-court identifications made by two witnesses, Pam Nolan and Ronda Klein, were improper since each had previously viewed him under unnecessarily suggestive circumstances. On April 22, 1982, at approximately 3:00 P.M., Nolan, age 12, and Klein, age 15, exited the school bus in advance of the victim. Each witness lived nearby and testified to having observed the red Nova proceeding behind the bus, and that defendant was the driver. The People candidly acknowledge the unduly suggestive nature of a showup conducted at the Ellenville barracks on April 26, 1982, in which Nolan identified defendant through a one-way mirror as one of two people in the room. We also consider that two days earlier, Nolan was taken to the Raleigh Hotel where defendant worked, and was permitted to view the Nova in the parking lot. She was then taken to the dining room where defendant was working among 30 to 40 people who were similarly dressed. Nolan, who was not permitted beyond the dining room doorway, was unable to make a positive identification at this time, but included defendant among a couple of possibilities *(see, People v Flores,* 101 AD2d 657). That same day, Klein, who was unable to identify defendant in a photo array, was taken to the Raleigh Hotel where she observed defendant arrive in the Nova and walk past her at a distance of some 40 to 50 feet. The People concede that this viewing may also have been suggestive. We also consider that each witness was informed that she had made a good identification after selecting defendant in a lineup conducted May 7, 1982.

Although we agree that these procedures were cumulatively suggestive and served to taint the subsequent identifications at the pretrial lineup *(see, People v Smith,* 109 AD2d 1096, 1098), we find that the People established an independent basis for the in-court identification of defendant by both Nolan and Klein *(see, People v Sapp,* 98 AD2d 784; *People v Chamberlain,* 96 AD2d 959; *People v Van Buren,* 87 AD2d 900; *People v Rogers,* 85 AD2d 843). Nolan testified that after getting off the bus, she "saw the guy, and he looked at me, and he turned his head quick". She indicated that this viewing lasted approximately 13 seconds and that she had a good look at his face. She described him as "blond, dirty blond, neck-length, shoul-

der-length [hair] * * * [with] a dirty-blond mustache". Klein observed the Nova traveling slowly behind the bus at a distance of 20 to 30 feet from her. She saw that the driver was wearing sunglasses, and as he drove by "he made a face at me and waved at me". She indicated it was a "sneaky" smile and that she had a full-faced view of the driver for 15 to 20 seconds. Although she failed to note his mustache, she described the driver as being in his late twenties, as wearing "clean cut" clothes and having dark blond hair, but "not brown". Each witness expressly confirmed that her ability to identify defendant was based on her viewing just prior to the commission of the crime. Considering these observations in their entirety, we find that the in-court identification of each witness was proper and that any error in allowing testimony as to the pretrial procedures was harmless *(People v Adams, 53 NY2d 241, 252; People v Chamberlain, supra, p 960)*. We note that Nolan's inability to identify defendant at the Raleigh Hotel and Klein's failure to pick him out of a photo array were not dispositive, since Nolan was prohibited from actually entering the dining room for a closer view and the photo array was not altogether in focus.

Defendant also contends that the trial court's refusal to charge the jury that identification must be proven beyond a reasonable doubt was error *(see, People v Whalen, 59 NY2d 273, 279)*. While we agree that the court's general charge as to reasonable doubt was lacking, given the overwhelming nature of the evidence presented, such deficiency was essentially harmless *(see, People v Crimmins, 36 NY2d 230)*. This is not an instance where identification testimony was the sole evidence implicating defendant *(see, People v Aucter, 107 AD2d 1008)*. Here, in addition to defendant's confession, forensic evidence was presented which proved that the hair and spermatozoa samples taken from the crime scene were similar to defendant's.

We have examined defendant's objections to the prosecutor's summation and conclude that while certain comments may have been unwarranted, defendant was by no means deprived of a fair trial *(see, People v Morgan, 66 NY2d 255)*.

Finally, we conclude that the consecutive sentences were not entirely improper. Although the burglary and sodomy convictions were material elements of the two felony murder convictions *(see, People v Jones, 69 AD2d 824)*, they were separate and distinct from the conviction for intentional murder. Thus, even if part of a continuous course of activity, the imposition of consecutive terms was appropriate *(see, Penal*

Law § 70.25 [2]; *People v Brathwaite,* 63 NY2d 839, 942-943; *People v Irving,* 107 AD2d 944; *People v Chandler,* 106 AD2d 677). Since the possession of a weapon charge was inextricably part of the murder charges, however, defendant was entitled to concurrent sentencing for that conviction *(see, e.g., People v Terry,* 104 AD2d 572). Defendant's further assertion that the merger doctrine applies is without substance. In view of the deplorable nature of this crime, we find no reason to otherwise disturb the sentence imposed.

Judgment modified, on the law and the facts, by reversing so much thereof as directed defendant to serve a consecutive term of imprisonment for the conviction of criminal possession of a weapon in the third degree; said sentence is to run concurrent with the remaining sentences, and, as so modified, affirmed. Kane, J. P., Casey, Weiss, Yesawich, Jr., and Harvey, JJ., concur.