274 N.J. Super. 285 (1994)
644 A.2d 103
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ANTHONY GALLAGHER, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 16, 1994.
Decided June 20, 1994.
*288 Before Judges BAIME, CONLEY and VILLANUEVA.
James K. Smith, Jr., Assistant Deputy Public Defender, argued the cause for appellant (Susan L. Reisner, Acting Public Defender, attorney; Diane Toscano, Assistant Deputy Public Defender, on the brief).
Catherine A. Foddai, Deputy Attorney General, argued the cause for respondent (Deborah T. Poritz, Attorney General, attorney; Ms. Foddai, of counsel and on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
The State Grand Jury returned a multi-count indictment charging defendant and fourteen other persons with defrauding gambling casinos by illegally triggering slot machine jackpots. Several codefendants pleaded guilty. The charges against the others were dismissed. Tried alone, without a jury, defendant was found guilty of conspiracy to commit racketeering (N.J.S.A. 2C:5-2; N.J.S.A. 2C:41-2d), racketeering (N.J.S.A. 2C:41-2c), attempted tampering with a witness (N.J.S.A. 2C:5-1; N.J.S.A. 2C:28-5a), attempted theft by deception (N.J.S.A. 2C:5-1; N.J.S.A. 2C:20-4), theft by deception (N.J.S.A. 2C:20-4), swindling and cheating a casino (N.J.S.A. 5:12-113a), use of a cheating device (N.J.S.A. 5:12-114b(2)), possession of a cheating device (N.J.S.A. 5:12-114c), forgery (N.J.S.A. 2C:21-1a(2) and (3)), unsworn falsification (N.J.S.A. 2C:28-3), perjury (N.J.S.A. 2C:28-1) and tampering with public records (N.J.S.A. 2C:28-7). The trial court sentenced defendant to a custodial term of ten years on the conviction for racketeering. A consecutive five year sentence was imposed on *289 the conviction for perjury. Concurrent sentences were imposed on the conviction for perjury. Concurrent sentences were imposed on several additional counts and the other convictions were merged. Thus, the aggregate sentence is 15 years.
Defendant appeals, contending that (1) the trial court erred when it refused to permit him to represent himself, (2) he was deprived of due process because prison officials mistakenly injected him with Prolixin, a mind-altering drug, during trial, (3) he was prejudiced by the prosecutor's failure to provide complete pretrial discovery, (4) his motion to compel disclosure of the identity of an informant was erroneously denied, (5) the trial court's verdict was against the weight of the evidence, and (6) the sentence was manifestly excessive. We are convinced that the trial court committed constitutional error by denying defendant his Sixth Amendment right to represent himself. Although the State's evidence was substantial, we are constrained to reverse.

I.
We need not recount the facts at length. The State's principal witness, Ross Durham, testified that he learned how to rig slot machines in the course of his employment with several Las Vegas casinos. To trigger an illegal jackpot, Durham would pry open the front plate of a machine, insert spacers, and manipulate the machine's spinning wheels using two thin wires. Teamwork was required to shield Durham's activities from detection. The leader of the group, John Vaccaro, would act as a "[l]ookout" and "signal[man]," and others would serve as "blockers" to obstruct customers and security personnel from viewing Durham while he was manipulating the machine. After a jackpot was "hit," Durham, Vaccaro and the blockers would immediately leave the area. The only person remaining would be the jackpot "claimer," who, by arrangement, would stand beside Durham while he was rigging the machine.
"Claimers" were not a permanent part of the criminal organization, because they were required to identify themselves to casino *290 personnel in order to obtain the jackpot. Consequently, claimers were constantly being recruited and were paid a percentage of the jackpot. One of the principal problems of the scheme was to obtain reliable "outsiders" to act as claimers and perform their "one-time" services.
The scheme was initially limited to Las Vegas. In the late 1970's and early 1980's, the group was triggering a dozen illegal jackpots each week. Durham was receiving $500,000 to $600,000 annually as were Vaccaro and a third unidentified compatriot. The group's attention then turned to Atlantic City.
In 1981, Durham, Vaccaro and a third member of the scheme travelled to Bayonne where they met Louis Sclafane who agreed to recruit claimers. Subsequently, two members of the Nevada group  Kevin Brennan and Frank Cullinen  also became members of the New Jersey organization. Durham testified that it was necessary to obtain defendant's approval before rigging a slot machine in New Jersey. At some point, Durham met with defendant in Miami. Defendant agreed to recruit claimers for Atlantic City jackpots. According to Durham, other meetings with defendant were later conducted in Florida. Durham allegedly overheard a conversation between defendant and Vaccaro indicating that Gallagher recruited and controlled claimers in New Jersey.
Gradually, the Atlantic City casinos began to react to mounting evidence of slot machine cheating. John Connors, vice president of security at Caesar's Hotel and Casino, received information from an anonymous source that a group was rigging slot machines and that one member was named Frank Cullinen and another John. Connors also discovered an unusual number of jackpots reported on a particular bank of slot machines. Reviewing casino videotapes, Connors confirmed that "highly unusual activity" occurred when the jackpots were struck.
The State Police were notified. In the course of their surveillance, they noticed Durham's presence near one of the highest paying slot machines. Detective John Medolla recognized Durham *291 and two of the blockers from videotapes of prior jackpot wins. The detective observed Durham rigging the machine. As soon as the jackpot was registered, Durham, Vaccaro and two other individuals were arrested. However, a "tall white female" and another male were able to escape.
Detective Medolla subsequently obtained information from one of the persons arrested that led him to a hotel room in Atlantic City. The car that had been registered to that room had just left the valet parking lot. Further inquiry revealed that the automobile was registered to Maureen Healy. The police found the automobile parked on St. James Place. Two individuals  Healy and the defendant  later returned to the car and were detained. The detective determined that Healy was the "tall white female" who had been seen playing the slot machine next to Durham immediately before he was arrested.
Based upon further information from one of the four detained individuals, law enforcement officials searched a hotel room at Caesar's Boardwalk Regency and discovered a slip of paper containing Frank Cullinen's telephone number. Further investigation revealed that telephone calls had been made from Cullinen's phone to a business in Bayonne that defendant managed.
Although defendant was initially released from custody and not charged, Durham subsequently entered into a plea agreement with the State and identified Gallagher as one of the principal members of the criminal scheme. Based upon this evidence, defendant was convicted of the offenses specified previously.

II.
We first consider defendant's contention that he was denied his Sixth Amendment right to represent himself. The salient facts pertaining to this claim can be briefly stated. On May 26, 1987, defendant requested that he be permitted to serve as his own attorney at trial. In making this request, defendant noted that he was a 55 year old business man who had graduated from college and had attended law school for two years. Defendant indicated *292 that he had successfully represented himself in two prior federal criminal trials, winning acquittals following protracted proceedings. Defendant added that he was currently representing himself with the aid of appointed standby counsel in an ongoing federal racketeering trial. In a lengthy colloquy, the trial court informed defendant of the nature of the charges against him and the possible range of punishment. Defendant was also advised of the technical problems he would encounter were he to represent himself. The court carefully explained to defendant the difficulties in acting as his own counsel and that it would be extremely unwise not to accept the assistance of a lawyer. Moreover, the court emphasized that defendant would be expected to conduct his defense in accordance with the relevant rules of evidence and procedure and that his lack of knowledge might impair the effectiveness of his defense. Based upon defendant's detailed responses to its inquiries, the court found that Gallagher's waiver of his right to an attorney was voluntary, knowing and intelligent.
The court nevertheless ordered the Public Defender's Office to appoint standby counsel. The judge stressed, however, that the role of the standby attorney was to be narrowly circumscribed. Specifically, defendant was told that he could make any motions he wished, but that standby counsel was to facilitate communication with the court and the prosecutor. Specifically, defendant was to channel all communications with the court and the Attorney General's Office through standby counsel. Defendant expressed concern that the standby attorney might override his strategic and tactical decisions. The court assured defendant that he would have complete control over his defense.
Ten days later, defendant moved for ancillary services including funds necessary to his investigation of the charges. In the course of argument, the deputy attorney general complained that defendant had telephoned his secretary concerning a motion he had made. He also noted that defendant had filed motions which dealt solely with federal law. Defendant explained that he had contacted the deputy attorney general's secretary because the Public *293 Defender had failed to appoint standby counsel in a timely manner and he was concerned with time constraints in filing his motions. At the hearing, an attorney representing the Public Defender objected to filing a general appearance on behalf of the defendant. The trial court ordered him to file a limited appearance, again explaining the circumscribed role of standby counsel. The court stressed that the attorney was to serve as the "exclusive means of communicat[ion]," but that Gallagher was responsible for his own defense.
On June 30, 1987, the trial court entered an order appointing the Public Defender's Office as standby counsel and denying defendant's request for investigative funds. The Public Defender was subsequently ordered to provide defendant with photocopies of grand jury transcripts. Both defendant and the Public Defender moved for leave to appeal from these orders. We granted these motions and consolidated the two appeals, but denied emergent relief.
The matter remained dormant until August 18, 1987. On that date, the trial court heard and decided various motions filed by the codefendants. Apparently forgetting that it had previously received defendant's application for a bill of particulars, the trial court inquired why he had filed no motions. Defendant responded that much of his time was being devoted to his appeal respecting the denial of his application for investigative funds. Defendant also noted that he was experiencing difficulties in his relationship with the standby attorney. Although the record is not altogether clear, it appears that defendant had prepared several motions, but that standby counsel had refused to file them. Standby counsel added that he construed the order appointing him differently than the defendant. The attorney noted that he interpreted his role as providing advice to the defendant, but that "it [was] not [his] obligation to file the motions." Because his role had been clarified by the court, the attorney assured the judge that the problem was not "likely to occur again."
*294 Defendant noted that he had sent a letter to standby counsel, asking him to file a formal application requesting that the deadline for making motions be extended until disposition of his appeal from the order denying investigative funds. A copy had been sent to the court. Defendant again requested that his right to file motions be preserved until the issue regarding investigative funds was resolved.
Acting on its own motion and without further notice, the trial court revoked its prior order permitting defendant to represent himself. The court reasoned that defendant did not "appreciate the ins and outs of ... motion practice" and that his "interests ... ha[d] not ... adequately been defended." We denied defendant's motion for emergent relief and dismissed the consolidated appeals as moot. The Supreme Court later denied defendant's motion for leave to appeal without prejudice to his right to renew in the Law Division his request to represent himself. On two subsequent occasions, the trial court denied defendant's applications for self-representation. It is against this factual backdrop that we examine defendant's Sixth Amendment claim.
Our analysis begins with the well-settled principle that the Sixth Amendment grants a defendant the right to represent himself in criminal proceedings. Faretta v. California, 422 U.S. 806, 821, 95 S.Ct. 2525, 2534, 45 L.Ed.2d 562, 574 (1975). Although the right of self-representation had its genesis in the common law of England, see 3 Halsbury's Laws of England § 1141 at 624-25 (4th ed. 1973), it was first held to be of federal constitutional dimension in Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562. Pointing to the colonists' "traditional distrust of lawyers[,]" id. at 826, 95 S.Ct. at 2537, 45 L.Ed.2d at 577, the Supreme Court there noted that the framers of the Constitution "always conceived of the right to counsel as an `assistance' for the accused, to be used at his option, in defending himself[,]" id. at 832, 95 S.Ct. at 2539, 45 L.Ed.2d at 580. While the Sixth Amendment does not explicitly provide for the right of self-representation, the Court stressed that the right had been guaranteed in *295 many colonial charters, id. at 828, 95 S.Ct. at 2537, 45 L.Ed.2d at 578, and "there [was] no evidence" that the framers "considered [it] inferior to the right of assistance of counsel[,]" id. at 832, 95 S.Ct. at 2539, 45 L.Ed.2d at 580. As phrased by the Court, "it is one thing to hold that every defendant, rich or poor, has the right to the assistance of [an attorney], [but] quite another to say that a [s]tate may compel [the accused] to accept a lawyer he does not want." Id. at 833, 95 S.Ct. at 2540, 45 L.Ed.2d at 580. The notion of compulsory counsel was thus said to be foreign to our constitutional history. Ibid.
Faretta holds that a state may not constitutionally impose a lawyer upon an unwilling defendant. To force an attorney on a reluctant defendant can only lead him to believe that the law contrives against him. Id. at 834, 95 S.Ct. at 2540, 45 L.Ed.2d at 581. The right to defend is personal, and it is the defendant, not his lawyer or the prosecutor, who will bear the consequences of a conviction. Although the defendant may conduct his defense ultimately to his own detriment, "his choice must be honored out of `that respect for the individual which is the lifeblood of the law.'" Id. at 834, 95 S.Ct. at 2541, 45 L.Ed.2d at 581 (quoting Illinois v. Allen, 397 U.S. 337, 350-51, 90 S.Ct. 1057, 1064, 25 L.Ed.2d 353, 363 (1970) (Brennan, J., concurring)).
When an accused serves as his own lawyer, he relinquishes many of the traditional benefits inherent in the right to counsel. In light of the importance of counsel in our "accusatorial system[,]" Rodriguez v. Rosenblatt, 58 N.J. 281, 295, 277 A.2d 216 (1971), the courts "indulge [in] every reasonable presumption against the waiver" of this constitutional right, State v. Guerin, 208 N.J. Super. 527, 533, 506 A.2d 743 (App.Div. 1986). Where an accused elects to waive his right to counsel, it is incumbent upon the court to insure that his choice of self-representation has been made knowingly, intelligently and with a full awareness of the dangers and disadvantages associated with that course. Faretta v. California, 422 U.S. at 835, 95 S.Ct. at 2541, 45 L.Ed.2d at 581-82. To ensure that a waiver satisfies this test, the trial court is *296 obliged to engage in a penetrating inquiry to determine that the defendant is aware of the dangers and disadvantages and that "`he knows what he is doing and his choice is made with eyes open.'" Ibid. (quoting Adams v. United States ex rel. McCann, 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268, 275 (1942); see also State v. Crisafi, 128 N.J. 499, 511-12, 608 A.2d 317 certif. denied, 130 N.J. 398, 614 A.2d 620 (1992)). These protections reflect the obvious but important truth that "the average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty[,]" Johnson v. Zerbst, 304 U.S. 458, 462-63, 58 S.Ct. 1019, 1022, 82 L.Ed. 1461, 1465-66 (1938), and that without the guiding hand of counsel he may lose his freedom because he does not know how to establish his innocence, Powell v. Alabama, 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L.Ed. 158, 170 (1932). However, once this searching and painstaking inquiry establishes that the defendant's election to represent himself is knowing and intelligent, he may not be forced to accept the services of an attorney. His choice may be a poor one, and may ultimately lead to his conviction, but it nevertheless must be honored.
Although a defendant's voluntary waiver of the right to an attorney must be respected, the court may constitutionally appoint standby counsel. McKaskle v. Wiggins, 465 U.S. 168, 176-77, 104 S.Ct. 944, 950, 79 L.Ed.2d 122, 132 (1984). The right to appear pro se exists to affirm the dignity and autonomy of the accused, but a criminal trial is not a "private matter" for there is more at stake than just the interests of the defendant. Mayberry v. Pennsylvania, 400 U.S. 455, 468, 91 S.Ct. 499, 506, 27 L.Ed.2d appointed to provide the defendant with advice and assistance and to facilitate communications with the court. The point to be emphasized, however, is that the right of self-representation "entails more than the opportunity to add one's voice to a cacophony of others[,]" and the Constitution thus "impose[s] some limits on the extent of standby counsel's unsolicited participation." McKaskle *297 v. Wiggins, 465 U.S. at 177, 104 S.Ct. at 950, 79 L.Ed.2d at 132-33. First, the pro se defendant is entitled to preserve actual control over the case he chooses to present, and second, participation by standby counsel should not be allowed to destroy the jury's perception that the accused is representing himself. Id. at 178, 104 S.Ct. at 951, 79 L.Ed.2d at 133. A defendant's right of self-representation "plainly encompasses certain specific rights to have his voice heard." Id. at 174, 104 S.Ct. at 949, 79 L.Ed.2d at 131. He must be allowed "to control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial." Ibid.
A defendant who forgoes his right to counsel must be "able and willing to abide by [the] rules of procedure and courtroom protocol." Id. at 173, 104 S.Ct. at 948, 79 L.Ed.2d at 130. "The right of self-representation cannot be insisted upon in a manner that will obstruct the orderly disposition of criminal cases." State v. Buhl, 269 N.J. Super. 344, 363, 635 A.2d 562 (App.Div. 1994). It is not a "license to abuse the dignity of the courtroom" or to refuse to "comply with relevant rules of procedural and substantive law." Faretta v. California, 422 U.S. at 834 n. 46, 95 S.Ct. at 2541 n. 46, 45 L.Ed.2d at 581 n. 46. A trial judge may "terminate self-representation by a defendant who deliberately engages in serious and obstructionist [behavior]." Ibid. Our research discloses numerous cases in which the right of self-representation has been denied or revoked because of the defendant's disruptive conduct. See, e.g., United States v. West, 877 F.2d 281, 287 (4th Cir.) (defendant forfeited his right to continued self-representation when he "directly attacked the district court's integrity and dignity" in his opening statement), cert. denied sub nom. Mills v. United States, 493 U.S. 869, 110 S.Ct. 195, 107 L.Ed.2d 149 (1989); People v. Clark, 3 Cal.4th 41, 10 Cal. Rptr.2d 554, 833 P.2d 561, 597-600 (1992) (trial court correctly revoked defendant's pro se status when confronted with defendant's election to stand mute for the remainder of the trial), cert. denied, ___ U.S. ___, 113 S.Ct. *298 1604, 123 L.Ed.2d 166 (1993); Radcliff v. State, 579 N.E.2d 71, 72-73 (Ind. 1991) (in light of defendant's "belligerent manner[,]" the trial court properly denied his request to appear pro se with the assistance of standby counsel); People v. Krom, 91 A.D.2d 39, 458 N.Y.S.2d 693, 698-99 (1983) (defendant's "disruptive and obstreperous conduct" justified the trial court's termination of his pro se status), aff'd, 61 N.Y.2d 187, 473 N.Y.S.2d 139, 461 N.E.2d 276 (1984); Green v. State, 277 Ark. 129, 639 S.W.2d 512, 513 (1982) (defendant's motion to proceed pro se was denied because of his declared refusal to comply with a court rule that briefs had to be printed or typewritten); State v. Johnson, 185 Conn. 163, 440 A.2d 858, 866 (1981) (defendant forfeited his right to self-representation when he engaged in "disruptive behavior" during trial), aff'd on other grounds, 460 U.S. 73, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983); People v. Glover, 90 A.D.2d 776, 455 N.Y.S.2d 285, 285-86 (1982) (defendant forfeited his right to proceed pro se when he engaged in "disruptive and baseless conduct" toward the trial judge); German v. State, 268 Ind. 67, 373 N.E.2d 880, 883 (1978) (defendant forfeited his pro se status when he was abusive during his cross-examination of a witness, when he argued with the trial judge despite being warned not to do so, and when he refused to participate further in the trial); People v. Manson, 71 Cal. App.3d 1, 139 Cal. Rptr. 275, 302-03 (1977) (in light of defendant's ongoing "disruptive conduct[,]" the trial court correctly denied his repeated requests to represent himself at trial), cert. denied, 435 U.S. 953, 98 S.Ct. 1582, 55 L.Ed.2d 803 (1978); People v. Heidelberg, 33 Ill. App.3d 574, 338 N.E.2d 56, 70-71 (1975) (defendant forfeited his pro se status because of his "unruly, insolent and insulting conduct designed to frustrate the proceedings"). We have also found cases where the defendant's physical incapacity has been held to be grounds for the denial of his right to defend himself. See, e.g., Savage v. Estelle, 924 F.2d 1459, 1463-66 (9th Cir.1990) (severe speech impediment precluded defendant from representing himself), cert. denied, ___ U.S. ___, 111 S.Ct. 2900, 115 L.Ed.2d 1064 (1991); Annas v. State, 726 P.2d 552, 555-56 (Alaska Ct. App. 1986) (advanced age and coronary disease resulting in *299 impaired memory barred defendant from self-representation); Pickens v. State, 96 Wis.2d 549, 292 N.W.2d 601, 611 (1980) (any physical disability that impairs ability to communicate may preclude self-representation); State v. Doss, 116 Ariz. 156, 568 P.2d 1054, 1058 (1977) (effect of stress upon defendant's seizure disorder and his ability to speak prevented him from proceeding pro se).
Not every deviation from the rules of practice justifies terminating the defendant's right of self-representation. In United States v. Flewitt, 874 F.2d 669 (9th Cir.1989), for example, the district court revoked the defendants' right to defend themselves because they made unreasonable discovery requests and failed to utilize materials the Government voluntarily provided. Id. at 671-72. The Court of Appeals reversed, holding that the "defendants' constitutional right of self-representation [could] not be abrogated [merely] because they were uncooperative with the Government in utilizing discovery opportunities or in making vague and poorly formulated motions." Id. at 673. While characterizing the defendants' efforts as "poor defense tactics" that "could have resulted in adverse rulings[,]" the court emphasized that "if they chose to represent themselves and, after the reasonable opportunities afforded by the [judge], chose tactics that left them poorly prepared to defend, that was their choice to make." Ibid.
Applying these principles, we conclude that the trial court committed constitutional error by terminating defendant's right of self-representation. In granting defendant's motion to appear pro se and in appointing standby counsel, the trial court correctly emphasized that Gallagher was to make the "final decision" respecting strategy and tactics and was to have complete control over his defense. The court repeatedly stressed the circumscribed role standby counsel was to assume. Stripped to its essentials, that role was to facilitate communications and serve as an intermediary.
From what appears in the record, defendant acted accordingly. Although defendant deviated from the trial court's order by *300 telephoning the deputy attorney general's secretary with reference to a pending motion, Gallagher later explained that he felt compelled to take this course because the Public Defender had not at that time appointed standby counsel and deadlines for making motions were looming. If any mistake was made, it was that of the attorney assigned by the Public Defender to serve as standby counsel who apparently refused to file defendant's pro se motions.
In revoking its order allowing defendant to represent himself, the trial court alluded to the complexity of the case and defendant's unfamiliarity with this State's motion practice. While the trial court was understandably concerned with defendant's alleged lack of legal competence, its analysis appears inconsistent with the sweeping and absolute language of Faretta. The Court there expressly recognized that a defendant who represents himself ordinarily will be at a disadvantage. Faretta v. California, 422 U.S. at 834, 95 S.Ct. at 2540, 45 L.Ed.2d at 581; see also State v. Russo, 243 N.J. Super. 383, 401-02, 579 A.2d 834 (App.Div. 1990), certif. denied, 126 N.J. 322, 598 A.2d 882 (1991). So too, defendant's failure to meet the trial court's expectations regarding the filing of motions, although a legitimate subject of concern, did not justify revocation of his right of self-representation. We do not construe McKaskle v. Wiggins, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122, to mean that a defendant's Sixth Amendment right of self-representation  so vigorously pronounced in Faretta  may be extinguished, as it was in this case, due to the defendant's lack of preparation prior to trial. There is no indication in McKaskle that a failure to make appropriate motions can result in a revocation of pro se status.[1] Instead, the underlying theme of Faretta and McKaskle is that if a defendant chooses to defend himself, he must be content with the quality of his legal representation. See United States v. Flewitt, 874 F.2d at 674.
*301 We need make no evaluation of how well or poorly defendant had mastered the intricacies of our rules of practice. His technical knowledge, as such, was not relevant to an assessment of his knowing and voluntary exercise of his right to defend himself. Faretta v. California, 422 U.S. at 836, 95 S.Ct. at 2541, 45 L.Ed.2d at 582. The defendant's right of self-representation was not dependent on his "technical legal knowledge." Ibid. We add that defendant's behavior prior to trial was neither contemptuous nor disruptive. We hold that the trial court committed reversible error by revoking his right to defend himself.

III.
In light of the result we have reached, we need not decide the remaining issues. However, we briefly address defendant's claim that the trial court erroneously permitted Connors to conceal the identity of the informer who apprised him of the existence of the criminal scheme to rig slot machines. It will be recalled that Connors, the vice-president of security for Caesar's Hotel and Casino, testified he received information about a "slot cheating team" operating in Atlantic City. We need not describe his testimony in detail. Suffice it to say, Connors originally verified this information with security personnel at Caesar's in Las Vegas, but he later had an "in person" conversation with an informer. Upon receiving this information, Connors immediately notified the State Police. In cross-examination, defense counsel asked for the informer's name. The trial court sustained the deputy attorney general's objection on the ground that the informer's privilege was applicable. Defendant contends that the trial court erred because Connors was not a law enforcement officer and was, therefore, not entitled to claim the privilege.
Defendant is correct in his claim that Evid.R. 36 (now N.J.R.E. 516) does not literally protect communications made by an informer to private security personnel. The Rule reads as follows:

*302 [a] witness has a privilege to refuse to disclose the identity of a person who has furnished information purporting to disclose a violation of a provision of the laws of this State or of the United States to a representative of the State or the United States or a governmental division thereof, charged with the duty of enforcing that provision, and evidence thereof is inadmissible, unless the judge finds that (a) the identity of the person furnishing the information has already been otherwise disclosed or (b) disclosure of his identity is essential to assure a fair determination of the issues.
[Emphasis added.]
Nevertheless, the policy underlying the informer's privilege would seem to be applicable where, as here, the information received from the informer is immediately passed to law enforcement officials. The privilege rests upon the need to encourage cooperation between the citizenry and the police. State v. Milligan, 71 N.J. 373, 381, 365 A.2d 914 (1976). The privilege recognizes the obligation of citizens to communicate their knowledge of crimes to law enforcement officials, and, by preserving their anonymity, encourages them to perform that responsibility. Roviario v. United States, 353 U.S. 53, 59, 77 S.Ct. 623, 627, 1 L.Ed.2d 639, 644 (1957); State v. Oliver, 50 N.J. 39, 42, 231 A.2d 805 (1967). Although designated the informer's privilege, the privilege is not that of the informer, but of government "to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." Roviario v. United States, 353 U.S. at 59, 77 S.Ct. at 627, 1 L.Ed.2d at 644; see also Cashen v. Spann, 66 N.J. 541, 552, 334 A.2d 8, cert. denied, 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 46 (1975). While the privilege is most frequently asserted by criminal law enforcement officials, it has been applied to administrative agencies as well. See, e.g., Grodjesk v. Faghani, 104 N.J. 89, 97-98, 514 A.2d 1328 (1986); McClain v. College Hosp. & New Jersey College of Medicine & Dentistry, 99 N.J. 346, 357, 492 A.2d 991 (1985); 8 Wigmore on Evidence § 2374 at 767-68 (J. McNaughton rev. 1961). Although the contours of the privilege may vary when it is claimed by private security personnel who immediately funnel the information received from the informer to law enforcement officers, many of the public policy concerns we have identified would appear to be applicable.
*303 We need not resolve the question here. Assuming the privilege was not applicable, the probative value of the information requested and the evidence sought was far outweighed by the collateral nature of the issue. Evid.R. 4 (now N.J.R.E. 403). The identify of the informer was neither critical to the defense nor essential to a fair determination of the issues. Cf. State v. Florez, 134 N.J. 570, 578-83, 636 A.2d 1040 (1994).
Of course, we cannot predict whether or in what context the issue will recur at defendant's retrial. We merely note that the trial court did not abuse its discretion in denying defendant's request in the circumstances presented.
Reversed and remanded for a new trial.
NOTES
[1] We add that defendant's request for an extension of the motion deadline pending disposition of his appeal regarding his right to investigative funds was not unreasonable. See In re Cannady, 126 N.J. 486, 600 A.2d 459 (1991).